# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

QUALITY BUILT HOMES, INC.,           )
MOORE COUNTY HOMEBUILDERS            )
ASSOCIATION, INC., BIG SKY           )
CONSTRUCTION, LLC, PAUL MAHON,       )     **MEMORANDUM OPINION**
CHARLES MCCLENDON,                   )     **AND ORDER**
                                     )
    Plaintiffs,  )           1:06CV1028
                                     )
    v.            )
                                     )
VILLAGE OF PINEHURST, a Village      )
in the State of North Carolina, the  )
VILLAGE COUNCIL OF PINEHURST,        )
GEORGE E. HILLIER, DOUGLAS A.        )
LAPINS, VIRGINIA F. FALLON,          )
LORRAINE A. TWEED, STEVEN J.         )
SMITH,                               )
                                     )
    Defendants.   )

This matter is before the court on consent jurisdiction on Defendants' Motion for Summary Judgment (docket no. 69) and Defendants' Motion to Strike Plaintiffs' Affidavits in Opposition to Defendants' Motion for Summary Judgment (docket no. 76). Plaintiffs have responded in opposition to the motions. For the following reasons, Defendants' motion to strike will be granted, Defendants' motion for summary judgment will be granted, and the case will be dismissed with prejudice.

Statement of the Case

Plaintiffs filed this lawsuit challenging several amendments to the Pinehurst Development Ordinance ("PDO"). The amendments were enacted September 26,

2006. The provisions at issue are: section 10.2.6.3, titled Architectural and Design Standards; and section 10.2.6.5, titled Landscaping Requirements for Single Family Residential (collectively the "Amendments"). In this action brought pursuant to 42 U.S.C. § 1983, Plaintiffs allege that the Amendments violate their state and federal due process and equal protection rights.[1] Plaintiffs also allege a claim for breach of contract based on a prior settlement agreement between the Village and some of the Plaintiffs. Moreover, on February 15, 2007, Plaintiffs supplemented the Complaint to add a claim under the North Carolina Public Records Act. The Village denies liability and has asserted various affirmative defenses.

There were originally five Plaintiffs. On October 12, 2007, Plaintiff Big Sky Construction, LLC, filed a voluntary dismissal of its claims. On January 31, 2008, this court dismissed Plaintiff Charles McClendon and all of his claims, based on his failure to comply with discovery. The remaining Plaintiffs are Quality Built Homes, Inc. ("QB"), Moore County Home Builders Association ("MCHBA"), and Paul Mahon

---

[1] In the complaint, the due process and equal protection claims are designated as the "First Claim for Relief," and Plaintiffs allege a "claim" under 42 U.S.C. § 1983 in the Second Claim for Relief. Section 1983 does not, however, in itself create any substantive rights. Rather, it is a vehicle through which a plaintiff may sue to protect other rights, such as the rights to federal due process and equal protection. *See Qwest Commc'ns Corp. v. City of Greensboro*, 440 F. Supp. 2d 480, 485 n.3 (M.D.N.C. 2006). Finally, I note that the due process and equal protection analyses here are the same under federal and state law. In other words, the lack of a federal constitutional claim for violation of due process or equal protection necessarily means that there is also no such claim under the North Carolina state constitution. *See, e.g., Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 436 n.6 (4th Cir. 2002) (noting that North Carolina courts have consistently interpreted the due process and equal protection clauses of the North Carolina Constitution as synonymous with their counterparts in the federal constitution).

("Mahon").  The named Defendants are the Village of Pinehurst, the Village Council of Pinehurst, and Village Council members George E. Hillier, Douglas A. Lapins, Virginia F. Fallon, Lorraine A. Tweed, and Steven J. Smith.[2]  The action is now before the court on Defendants' motion for summary judgment.[3]

Background

Plaintiff QB is a builder that constructs single-family homes in the Village of Pinehurst.  QB's business includes building homes primarily on lots in Pinehurst R-8 and R-10 zoning districts to sell to individuals with incomes ranging from $30,000 to $40,000.  Plaintiff MCHBA is a non-profit organization representing Moore County homebuilders.  Plaintiff Paul Mahon is a landscaping sub-contractor in Moore County, who works predominantly on affordable residential housing construction projects in Pinehurst.

Facts

The Village is a residential, retirement, and resort community.  (Revised Wilkison Aff. ¶ 2.)  The Village's "major industries are recreation and tourism," and it was designated as a National Historic Landmark in 1996.  (*Id.* ¶ 6.)  Aesthetics are of "primary importance" and the Village's "most important asset."  (Revised Wilkison

---

[2] In addition to being council members, Steven J. Smith was at all relevant times the Mayor of Pinehurst, and George E. Hillier was the Mayor Pro-tem.

[3] In their supporting brief, Defendants have failed to present pinpoint cites for numerous statements made in affidavits, etc., thus requiring the court to conduct tedious searches in order to verify the accuracy of the parties' sources.  In the future, Defendants are admonished to cite to the specific paragraph, page number, and/or section number of their exhibits, particularly when citing to a direct quote.

3

Aff. ¶ 5.)  Tourism is one of the Village's "most important industries" and the "foundation of the community," and "[i]f the beauty and character of the Village [are] not maintained, this will be put at risk."  (Revised Wilkison Aff. ¶ 5; *see also* Def.'s Inter. Resp. 19.)  Unlike the mountains and the coast, which have permanent geographic features to attract tourists, the Village depends on its unique ambiance, which is why "land use regulation is extremely important to maintain this asset." (Wilkison Aff. ¶ 5.)  The preservation of aesthetics has been a long-term objective of the Village and is reflected in its ordinances and long-range planning documents. (*See id.* ¶ 5.)  For example, the PDO's Statement of Intent provides: "It shall be the primary goal of this Ordinance to protect the quiet, tranquil and unusually attractive [V]illage atmosphere . . . ."  (PDO § 1.2., attached as Ex. No. 24 to Pls' Mot. Summ. J.)

Under North Carolina law, zoning regulations must be enacted in accordance with a comprehensive plan.  *See* N.C. GEN. STAT. § 160A-383.  In the Village, this document is the Pinehurst Comprehensive Long Range Village Plan (the "Comprehensive Plan").  (*See* Comprehensive Plan, attached as Ex. E to Correll Aff.)  The Comprehensive Plan was rewritten in 2003 following "two years of careful study, deliberation and debate involving the citizens of Pinehurst, the Comp Plan Steering Committee, Village Council, Village Staff[,]" and others.  (Correll Aff. ¶ 19.) The importance of aesthetics is addressed throughout the Comprehensive Plan, and the rewrite identified future methods of regulation that should be implemented to

4

protect the unique character of the Village and preserve the citizens' quality of life. (*See* Comprehensive Plan, Correll Aff. Ex. E.) These goals included the addition of architectural and landscaping standards that would apply to new construction, so that the build-out of remaining lots would be consistent with the character of the Village and its architecture and landscaping. (*See id.*)

On September 26, 2006, the Village amended section 10.2.6.3 of the PDO to require all new dwellings in residential zoning districts R-10, R-15, and R-20 to include, among other things, a certain number of specified architectural elements, and section 10.2.6.5 of the PDO to require, among other things, builders to meet a landscaping point system in all residential zones. (*See* PDO pt. 1, attached as Ex. 24 to Pls.' Mot. Summ. J.) The Amendments apply only to new construction. More specifically, the architectural requirements provide, among other things, that homes contain 3 or 4 of the architectural elements listed at PDO section 10.2.6.3. That section provides a variety of objective design choices "based on extensive studies of existing architecture considered to be typical of Pinehurst." (Revised Wilkison Aff. ¶ 4; *see also* Harris Dep. 54-56, 61; Pls.' Inter. Resp. 7-8.) The landscaping amendments regulate landscaping for new, single-family homes in all zoning districts except for one and are intended to preserve trees and vegetation native to Pinehurst and to maintain community aesthetics. (Revised Wilkison Aff., pt. 2, Ex. C, Interoffice Memo; PDO Appendix A & B.) The landscaping amendments require, for instance, builders who are constructing single-family residences in Pinehurst to

5

obtain a tree survey and plant a certain number of trees to meet the landscape point requirement for each lot.  (*See* PDO § 10.2.6.5(a).)

It is undisputed that before enactment of the Amendments, QB's business primarily included building houses on lots in R-8 and R-10 zoning districts for sale to low- to moderate-income individuals.  The parties also do not dispute that lower priced housing is typically built on lots in R-8 and R-10 zoning districts in the Village of Pinehurst because those districts contain smaller lots.  Plaintiffs submit that due to the increased requirements of the architectural and landscaping Amendments, constructing single-family homes on lots in the R-8 and R-10 zoning districts now costs more than before the enactment of the Amendments.  Plaintiffs further contend that builders in Pinehurst have had to increase the sales price of their houses to compensate for the cost increase.  Plaintiffs contend that the price increase has eliminated new affordable housing from Pinehurst and has caused sales to be lost.  Plaintiffs also contend that this construction slowdown has eliminated work for subcontractors such as landscaper Plaintiff Mahon.

Summary Judgment Standard

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Zahodnick v. International Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

Defendants' Motion to Strike Plaintiffs' Affidavits in Response to the Summary Judgment Motion

Before addressing the substance of the summary judgment motion, the court must first address Defendants' motion to strike the affidavits submitted by Plaintiffs in response to Defendants' motion for summary judgment. Defendants ask the court to strike the following affidavits: (1) Affidavit of Nicole (Nikki) Bowman; (2) Affidavit of Neal Smith; (3) Affidavit of John Dowd; (4) Affidavit of Becky Csiszar; (5) Affidavit

of John Howe; and (6) Affidavit of Ronald Jackson.  I will grant the motion to strike for the following reasons:

(1) Nikki Bowman

Nikki Bowman is a real estate broker in the Pinehurst/Moore County area, specializing in the sale of new, residential houses to first-time home buyers. Bowman asserts in her affidavit, among other things, that the Amendments have drastically decreased the supply of "affordable" housing in the Village.  (*See* Bowman Aff. ¶ 3.)  As an example, Bowman states that, as a result of the Amendments, one of the neighborhoods that typically caters to people seeking "affordable" housing now offers very few homes for sale in the $150,000 or less price range.  (*See id.*)  Bowman drew her conclusions by accessing data on a private, internet database available to real estate brokers (the "MLS listings").  (*See* Bowman Aff. ¶ 4.)

I agree with Defendants that the Bowman affidavit should be stricken.  Here, after the deadline to do so had long passed, Plaintiffs submitted an expert report of Nikki Bowman.  On March 4, 2008, the court entered an order striking the expert report because it was not submitted in a timely manner.  Now, in opposing summary judgment, Plaintiffs have submitted an "Affidavit" of Nikki Bowman that purports to be lay testimony but which is in substance a recitation of her earlier stricken expert report.  The recasting of the Bowman expert report as an Affidavit submitting "lay testimony" is a clear effort to circumvent this court's prior order striking the expert

report by Nikki Bowman.  The Bowman Affidavit and accompanying exhibits will be stricken.

(2)  Neal Smith

Neal Smith is the founder and president of Neal Smith Engineering, Inc. (Smith Aff. ¶ 2.)  Neal Smith Engineering, Inc. works extensively with residential homebuilders in the Pinehurst/Moore County area.  (*Id.*)  In his Affidavit, Smith discusses data he has relied on regarding the increase in construction costs as a result of the Amendments.  (*Id.* ¶¶ 3, 4 & 6.)  In their discovery responses, Plaintiffs initially identified Smith as a potential expert witness and represented to Defendants that Smith would prepare a report regarding building cost increases as a result of the Amendments.  (*See* Defs.' Sec. Mot. Strike, Ex. G & H.)  Plaintiffs also asserted that they would supplement their discovery response once the report was available. Plaintiffs never submitted the expert report, nor did they supplement their discovery response.  (*See* Defs.' Sec. Mot. Strike, Ex. J.)  The Village renewed its request for Smith's Expert Report during QB Vice-President Ronald Jackson's December 11, 2007, deposition (almost seven weeks before the close of discovery) and were told that the Smith expert report would be done "pretty quick."  (*See* Ex. 1 to Defs.' Sec. Mot. Strike, Jackson Dep. at 115-18.)

Plaintiffs never submitted an expert report by Smith.  Instead, they submitted the Smith Affidavit.  The information in and attachments to the Smith Affidavit was requested in discovery, but was not produced until after the discovery period had

9

expired.  Defendants note that no "supplement" was provided, and that Plaintiffs first provided the evidence in their Response brief.  Rule 37(c) clearly states that failure to provide information or to identify a witness as required by Rule 26(a) or (e) results in the preclusion of that information or witness to supply evidence on a motion, a hearing, or at a trial, "unless the failure was substantially justified or is harmless."  FED. R. CIV. P. 37(c).  Plaintiffs have not shown that their failure to disclose was either substantially justified or harmless.  Moreover, Rule 26 provides that "[i]f Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted *only after the report is provided.*"  FED. R. CIV. P. 26(b)(4)(A) (emphasis added).  Since Defendants were expecting an expert report from Smith, they did not take his deposition during the discovery period.  Plaintiffs did not produce the Smith Affidavit until they filed their response to the motion for summary judgment, long after Defendants lost their opportunity to depose Smith, thus clearly prejudicing Defendants.

Furthermore, despite Plaintiffs' contention now that they are not using Smith as an expert but as a mere "fact" witness, Smith renders several opinions based on technical and other specialized knowledge that is clearly within the scope of Rule 702 of the Federal Rules of Evidence.  (*See* Smith Aff. ¶¶ 4 & 5.)  Smith's affidavit is based on the fact that he is an "engineer" who "works extensively with residential homebuilders in the Pinehurst/Moore County area," whose testimony is based on his "business experience" and "professional experience."  (Smith Aff. ¶¶ 2-5.)  Thus, by

10

Plaintiffs' own admission, Smith is merely involved in the case because of Plaintiffs' request to provide testimony, and he is not otherwise directly involved as a fact witness. (*See* Ex. 1 to Defs.' Sec. Mot. Strike, Jackson Dep. at 115-17.) Indeed, the information that Smith testifies to as a "fact" witness is exactly the same subject matter for which he was identified as an "expert," i.e., "the cost increase of building a house that homebuilders will face as a result of the architectural amendments." (Pls.' Inter. Resp. No. 4.)

In sum, the failure to provide an expert report, including the facts relied upon by Smith and his reasoning, has substantially prejudiced Defendants. Without an opportunity to depose Smith, Defendants have been deprived of the ability to test whether Smith's testimony was based on sufficient facts or data; whether his testimony was the product of reliable principles and methods; and whether he applied those principles and methods reliably. *See* FED. R. EVID. 702. For all these reasons, Smith's Affidavit and the accompanying exhibits will be stricken.

(3) John Dowd

The Affidavit of landscaper John Dowd attests to increased costs that builders will face as a result of the Amendments. As with affiant Smith, Plaintiffs initially indicated that they would use Dowd as an expert witness and that he would provide an expert report. (*See* Defs.' Sec. Mot. Strike, Ex. C.) As with affiant Smith, Plaintiffs never provided an expert report from Dowd, nor did they disclose during the discovery period the information provided in Dowd's Affidavit. Thus, Defendants

11

never had an opportunity to depose Dowd.  Moreover, as with Smith, the information attested to in the Dowd Affidavit is in the form of expert, rather than lay, testimony. For all these reasons, the Dowd affidavit will be stricken.

(4) Becky Csiszar

Becky Csiszar is a real estate broker in the Pinehurst/Moore County area, and she specializes in the sale of residential houses in the Pinehurst/Moore County market.  Csiszar testifies in her Affidavit about sales of new homes in the Pinehurst area and basically concludes that sales of new homes in Pinehurst declined after the Amendments were enacted.

Plaintiffs failed to disclose the identity of affiant Csiszar to Defendants during the discovery period.  *See* FED. R. CIV. P. 26(a)(1), 26(a)(2), & 26(e).  Csiszar's identity, testimony, and exhibits also should have been disclosed in a number of interrogatories and requests for production of documents submitted to Plaintiffs by the Village.  It is undisputed that Plaintiffs failed to disclose or supplement their discovery responses to reveal Csiszar as a witness, and they have not shown that their failure to disclose or supplement was substantially justified or harmless.[4]  *See*

_____

[4] Plaintiffs point to their disclosure of a letter dated October 4, 2007, from Csiszar to the Village, and argue that this amounted to disclosure of Csiszar as a potential witness. This letter was one of thousands of documents produced in discovery and was not enough to alert Plaintiffs that Csiszar was a potential witness.  The Rules clearly state that if Plaintiffs have knowledge of a witness, they are obligated to provide the identity of that witness pursuant to the Initial Disclosures and in response to Interrogatories.  Plaintiffs responded to the Village's Interrogatories on December 3, 2007, and supplemented them on December 7, 2007, two months after the Csiszar letter was written, and nowhere in their responses did Plaintiffs disclose their intent to use Csiszar as a witness.

FED. R. CIV. P. 37(c)  (automatic exclusion for failure to disclose or supplement unless failure was substantially justified or harmless).  Because of their failure to disclose Csiszar as a witness, Defendants were never given the opportunity to depose her.  Moreover, as Defendants note, Plaintiffs appear to be attempting to introduce expert testimony through Csiszar's affidavit, but Csiszar was never designated as an expert, nor even as a potential witness.  For these reasons, Csiszar's Affidavit and accompanying exhibits will be stricken.

(5) John Howe

John Howe is the owner of a nursery and provides landscaping products and services in the Pinehurst area.  In his Affidavit, Howe sets forth the prices for various plants that are required to be planted under the Amendments.  As with affiant Csiszar, Plaintiffs never identified the existence of John Howe to Defendants as they were required to do under Rule 26.  In addition, the Village repeatedly requested any and all documentation supporting Plaintiffs' claim that the Landscaping Amendments caused the cost of constructing a single-family home as well as the sales price of a single-family home in Pinehurst to increase.   In Plaintiffs QB and Mahon's Supplemental Responses to Defendants' First Set of Interrogatories, Plaintiffs did allege that QB had obtained landscaping quotes from John Dowd Landscaping and Aurora Hills Nursery.  (*See* Pls.' Supp. Resp. Pp. 3-5.)  Plaintiffs, however, never mentioned John Howe's name.  Moreover, Plaintiffs never provided the Village with these quotes, despite specific requests that the Village made directly to QB Vice-

13

President Ronald Jackson during his deposition, as well as in a subsequent letter to Plaintiffs' counsel. (*See* Ex. 1 (Jackson Dep. at 129-33); Defs.' Sec. Mot. Strike, Exs. M & N.) For all these reasons, the Howe Affidavit will be stricken.

(6) Ronald Jackson

Ronald Jackson is the Vice-President of Plaintiff QB. Jackson has submitted an affidavit attesting to, among other things, the median age and household income for the Village and Moore County, and the increase in building costs as a result of the Amendments, and asserting that QB has lost potential sales because of the Amendments. Jackson also offers assertions regarding the architectural and landscaping requirements under the Amendments, such as the opinion that the architectural requirements are purely cosmetic and the opinion that the landscaping requirements create a danger to homeowners and that the lots cannot hold the number of plants required under the Amendments.

I agree with Defendants that portions of the Jackson affidavit purports to present expert testimony. Jackson was never identified at any stage in the litigation as a potential expert witness, nor was any expert disclosure or expert report served on the Village at any time before the filing of the Jackson Affidavit. As noted, the failure to disclose and supplement results in the automatic sanction of preclusion of that evidence unless the failure was substantially justified or harmless. FED. R. CIV. P. 37(c). Plaintiffs have offered no reason for the failure to disclose, and the Village has furthermore been prejudiced by the failure to provide the testimony of Jackson

14

in the form of an expert report.  Although Defendants deposed Jackson, Plaintiffs never disclosed during the discovery period the information that Jackson refers to in his affidavit to support Plaintiffs' argument regarding the increased costs of building.   Moreover, I agree with Defendants that some of the information in his affidavit does not appear to be based on personal knowledge, as much of Jackson's affidavit contains conclusory and speculative statements.   *See Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir. 1984) (affirming a district court's finding that an affidavit did not meet the requirements of Rule 56(e) because "[t]he entire content of the affidavit [was] conclusory, it [did] not set forth facts of which [Barwick had] personal knowledge and it [did] not give specific facts, but only generalities").   To the extent that certain portions of the Affidavit are based on personal knowledge and constitute lay testimony, these facts are already in the record on summary judgment.[5]   For these reasons, the Jackson Affidavit and accompanying exhibits will be stricken.

For the reasons stated above, the motion to strike will be granted.  The motion for summary judgment is being decided, therefore, without evidence presented by Plaintiffs in the stricken affidavits.  *Significantly, however, even if the court were to deny the motion to strike and consider the evidence in the affidavits, the result would be the same.*  The affidavits submitted by Plaintiffs purport to present evidence that as a result of the Amendments, it is more costly to build houses in residential zones

_____

[5]   For instance, Jackson attests that the Village rejected QB's submission of construction plans for two lots owned by QB because the plans did not comply with the Amendments.

R-8 and R-10 and that the Amendments have in fact prevented the construction of "low-income" and/or "affordable" housing in the Village. As will be discussed more thoroughly below, even if Plaintiffs' evidence regarding the increase in costs were not stricken, and even if this evidence were accepted as undisputed, Plaintiffs have still not shown that Defendants violated their equal protection or due process rights.

 A.  Substantive Due Process Claim

Plaintiffs assert claims for violations of federal and state substantive due process.  Section 19 of Article I of the North Carolina Constitution contains the "Law of the Land Clause" and provides: "No person shall be . . . deprived of his life, liberty, or property, but by the law of the land."  N.C. CONST. art. I, § 19.  This clause is synonymous with the Fourteenth Amendment due process clause of the federal Constitution.  *Woods v. City of Wilmington,* 125 N.C. App. 226, 230, 480 S.E.2d 429, 432 (1997); U.S. CONST. amend. XIV, § 1 (" . . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . . [.]"). To recover for a violation of substantive due process, Plaintiffs must prove that they had a property interest, that Defendants deprived them of that interest, and that the deprivation "falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency."  *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 440 (4th Cir. 2002) (internal quotation marks omitted).  To prove this third element, Plaintiffs must show that the challenged actions had "no foundation in reason and [were] a mere arbitrary or irrational exercise of power having no substantial relation

16

to the public health, the public morals, the public safety or the public welfare in its proper sense." *Sylvia Dev. Corp.*, 48 F.3d at 827 (internal quotation marks omitted). Finally, in substantive due process claims, the property right determination is governed by state law. *See Browning-Ferris Indus. v. Wake County*, 905 F. Supp. 312, 317 (E.D.N.C. 1995).

The remaining Plaintiffs in this case are builder QB, landscaper Mahon, and builder association MCHBA. Not one of these three remaining Plaintiffs has identified a protected property right that has been infringed. First, Plaintiff QB has shown that it purchased several lots in the Village, and that it then submitted construction plans to build on some of the lots. The Village denied the construction plans because they failed to meet the requirements of the amended ordinances. QB contends that its construction plans complied with the ordinances as they were written before the landscaping and architectural Amendments were enacted. QB, however, has offered no authority for the proposition that it has a property right in constructing homes that do not conform with current zoning laws, and it is undisputed here that QB had not already received a permit to build when the zoning laws were changed.[6]

---

[6] It is clear under North Carolina law that a landowner does not acquire a vested right to build, contrary to the provisions of a subsequently enacted zoning ordinance, by the mere purchase of land in good faith with the intent of building on the land. *See MLC Auto., LLC v. Town of Southern Pines*, __ F.3d __, 2008 WL 2611130, at *11 (4th Cir. 2008) (discussing vested property rights under North Carolina law); *see also Finch v. City of Durham*, 325 N.C. 352, 384 S.E.2d 8 (1989). Furthermore, although QB has a general right to contract for the sale of homes on the lots that it owns, this right is, nevertheless, subject to reasonable restrictions by the Village. As discussed, *infra*, the Village's

17

Moreover, there is no authority to support Plaintiffs' contention that they have a constitutional "right" to build new, single-family houses in the R-8 and R-10 zoning districts for a certain cost, so that they may then sell these houses, at Plaintiffs' suggested price of $159,000 to $190,000 or less, to "lower-income" buyers and still make a profit. Indeed, the fact that an ordinance makes compliance more expensive or affects property values does not render it unconstitutional. *See Appeal of Parker*, 214 N.C. 51, 56, 197 S.E. 706, 710 (1938). The same is true of Plaintiff MCHBA, which represents builders in Moore County. Plaintiff MCHBA has not shown that the builders it represents have any right to build houses according to zoning ordinances that are no longer valid.

Plaintiff Mahon is a subcontractor who does landscaping and grading in the Pinehurst area. (*See* Mahon Dep. at 10, Exs. 9-11 to Defs.' Mot. Summ. J., docket no. 69.) Plaintiffs allege in the Complaint that before the enactment of the Amendments, Mahon performed services for single-family homebuilders that constructed "affordable" houses in Pinehurst on lots in the R-8 and R-10 zoning districts. The Complaint further alleges that Mahon has lost and will continue to lose income and work because fewer affordable houses will be built in Pinehurst as a result of the Amendments.

Mahon has not shown that any protected property right has been infringed. First, although Mahon has a general right to earn wages, he does not have the right

restrictions are entirely reasonable.

to earn a specific amount of wages. In any event, Mahon's own deposition testimony reveals that he cannot show that passage of the Amendments caused the purported drop in his income. For instance, he asserts that his income went down in 2007 because contractors did not call him for as much work; he does not, however, know why they did not call, except what QB has told him. (*Id.* at 42-48.) Furthermore, Mahon has not identified any jobs he has lost because of the Amendments, and he does not know how much QB's costs have gone up. (*Id.*) He does not know whether the alleged price increases in the Complaint are caused by the Amendments or whether they are correct. (*Id.* at 58-65; 70-71.) Mahon has no input as to the price charged for the houses he works on and is paid the same no matter what. (*Id.* at 78-83.) Finally, Mahon stated that he works in all zoning districts and his price and profit are the same in all of them. (*Id.* at 93-96.)

In sum, none of the remaining Plaintiffs have identified a protected property right that has been infringed.

In any event, even if Plaintiffs could identify a protected property interest, there was no due process violation as a matter of law. Courts have held that it is a proper exercise of the police power to adopt zoning regulations for the sole purpose of protecting a community's aesthetics, provided the ordinance is reasonable. *State v. Jones*, 305 N.C. 520, 530, 290 S.E.2d 675, 680 (1982) (where county ordinance regulated the use of junkyards and automobile graveyards); *Goodman Toyota, Inc. v. Raleigh*, 63 N.C. App. 660, 663-64, 306 S.E.2d 192, 194-95 (1983) (where city

19

ordinance prohibited the use of windblown signs such as blimps).  The North Carolina Supreme Court has specifically stated that a regulation is lawful if the aesthetic purpose to which the regulation is reasonably related outweighs the burdens imposed on the private property owner by the regulation.[7]  *Jones*, 305 N.C. at 530-31, 290 S.E.2d at 681.  Moreover, the Fourth Circuit has also described preservation of a "community's aesthetic character" as a "legitimate land use issue[]."  *See Sylvia Dev. Corp.*, 48 F.3d at 829; *see also CMH Mfg., Inc. v. Catawba County*, 994 F. Supp. 697, 711 (W.D.N.C. 1998) (holding that mobile home manufacturers and a building material supplier did not establish a due process or equal protection violation where a county zoning ordinance required mobile homes to have exterior siding and roof shingles of the type commonly used in standard residential construction; stating that "[a]ddressing citizen concerns over aesthetics, zoning, and falling property values . . . is clearly a legitimate government interest").

The Village has presented evidence to show that it enacted the Amendments to further the corollary benefits to the general community, such as the protection of property values, promotion of tourism, and preservation of community character.  As noted, the Village is a resort and retirement community.  Moreover, the Village was designated as a National Historic Landmark by the United States Secretary of the

---

[7] In *Jones,* the North Carolina Supreme Court observed that aesthetic concerns can provide corollary benefits to the general community such as "protection of property values, promotion of tourism, indirect protection of health and safety, preservation of the character and integrity of the community, and promotion of the comfort, happiness, and emotional stability of area residents."  305 N.C. at 530, 290 S.E.2d at 681.

Interior in 1996.  (*See* Rev. Aff. Wilkison ¶ 6.)  According to Defendants, the purpose of the architectural and landscaping Amendments is to preserve the special character, integrity and ambiance of the Village through aesthetic zoning.  (*See* Rev. Aff. Wilkison ¶¶ 4-6.)  This is a legitimate government interest, and the architectural and landscaping Amendments are rationally related to this interest.  In Summer 2005, the Village Staff undertook an extensive process to draft amendments that would reflect the character of Pinehurst, preserve aesthetics, and maintain and enhance property values.  (*See* Rev. Wilkison Aff.; Correll Aff.; Harris Dep. at 92.)  To further this goal, the Village Staff reviewed and analyzed thousands of documents.  The analysis included a study of the potential financial impact, and it was determined that compliance would not be cost-prohibitive.  (Correll Aff. ¶¶ 23, 30; *see also* Defs.' Inter. Resp. 18.)  A fourteen-member Roundtable Committee (the "RC"), comprised of Village officials and staff, local architects and landscapers, and the MCHBA President, was appointed to assist with the process.  (Rev. Wilkison Aff. ¶ 22; Correll Aff. ¶ 22; Harris Dep. at 29-33.)  The RC members were well-respected community members with extensive experience in building and landscaping in the Village.  (Harris Dep. at 31-33, 94-95.)  The RC met for many months and studied ordinances from other jurisdictions, architectural styles in the Village, and listened to many hours of citizen input before finalizing the proposed Amendments.  (*See* Wilkinson Aff.; Correll Aff.)

As noted, the architectural Amendments apply in the R-10, R-15, and R-20 districts only. Defendants assert that the decision to regulate in these districts only was based on the following rationales: First, these districts contain the greatest number of vacant lots in the Village. (*See* Rev. Aff. Wilkison ¶ 8.) These lots are located around the downtown area and surround the historic core of the Village, which are the areas most crucial to maintaining the Village's aesthetic character. (*Id.*) The R-30 and R-210 districts, which are excluded from the architectural Amendments, are comprised primarily of new subdivisions, and have their own covenants and architectural review boards. (*Id.*) The excluded R-5 and R-8 districts are also located away from the historic Village core, and the style of homes in those districts already differed from other parts of Pinehurst. (*Id.* ¶ 9.) Furthermore, the Village's research revealed that lower-income residents currently reside in the R-5 and R-8 districts, and compliance with architectural requirements in those districts could cause an undue financial burden. (*Id.*) Therefore, the R-5 and R-8 zoning districts are also excluded from the architectural requirements in the Amendments.

The landscaping Amendments require that new homes must be landscaped with a certain number of plants, which is determined based on a point system. The number of points required in R-8 and R-10 are less than those required in R-15, R-130, and R-210. The landscaping amendments apply in all zoning districts, except that no tree survey is required in R-210. (*See* PDO 10.2.6.5(a).) The rationale for the landscaping Amendments was based on the Village's concern about clear-

cutting on smaller lots. Since lots in R-210 are a minimum of five acres, clear-cutting was not a concern for this district. (*See* PDO 10.2.2.2 & 10.2.6.5(a).)

Defendants' evidence demonstrates that the Amendments were passed after careful consideration, and they were based on research of the Village's existing character, environment, and aesthetics, the Village Staff's analysis of the cost impact of the Standards, and discussions with local design professionals, home builders, and others in the community. (*See* Rev. Wilkison Aff.) Furthermore, the benefits of the Amendments outweigh the burden to builders such as QB. That is, even assuming that the Amendments will increase the cost to build in the R-8 and R-10 residential zones, Plaintiffs have not shown that the cost is so prohibitive that the burden to them outweighs the benefits to the community.[8] In sum, even if Plaintiffs had presented evidence of a protected property right (which they have not), the Village's rezoning in this case was rationally related to a legitimate government interest. *Cf. Marks v. City of Chesapeake, Va.,* 883 F.2d 308, 312 (4th Cir. 1989) (holding that a permit denial was arbitrary and capricious where the zoning board was swayed by religious prejudice); *Scott v. Greenville County,* 716 F.2d 1409, 1421 (4th Cir. 1983) (where the zoning board arbitrarily placed a moratorium on building

---

[8] It is undisputed that QB has not built a home in Pinehurst since the Amendments were enacted; thus, Plaintiff QB has not presented any evidence of actual costs incurred in building a house that complies with the Amendments, or the effect of the new costs on the ability to sell a house that complies with the Amendments. Plaintiffs have offered affidavits purporting to estimate the likely costs of building since the Amendments were enacted. The court has stricken these affidavits for the reasons stated herein; in any event, as discussed *supra*, even if the court had admitted this evidence, the result would be the same.

permits on property that was to be developed for low-income housing).  For all these reasons, the court will grant summary judgment to Defendants as to Plaintiffs' state and federal due process claim.

## B.  Exclusionary Zoning Claim

To the extent that Plaintiffs are attempting to assert a claim of "exclusionary zoning," that claim also fails.[9]   Plaintiff QB contends that the architectural and landscaping Amendments have prejudiced "lower-income" buyers.  QB has not, however, sufficiently defined what "affordable" housing is in this case.  For instance, QB not does purport to be a developer of "low-income" housing projects subsidized with Section 8 HUD funds.  *Cf. Scott*, 716 F.3d at 1412.  Furthermore, Plaintiffs have not presented evidence as to the income levels of its clients or how much these unnamed individuals can afford based on income, assets, and other factors.  In sum, Plaintiffs have not specified at all what "lower-income" or "affordable" housing is; thus, their alleged class of purchasers and builders of "lower-income" or "affordable" housing is not defined.  *Cf. Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 139 (3d Cir. 1977) (where the court found in an exclusionary zoning case that potential tenants of a low-income public housing project had standing to sue).

_____

[9]  The only "lower-income" Plaintiff in this case, Charles McClendon, has been dismissed for failure to comply with discovery.  Since none of the remaining Plaintiffs are "lower-income" buyers, the remaining Plaintiffs arguably do not even have standing to assert the claims of this purported class, which Plaintiffs have not sufficiently defined.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490 (1975) (holding that in exclusionary zoning cases plaintiffs must generally assert their own rights and not the rights of third parties).  Even if the remaining Plaintiffs have standing based on their own injury, the claim of "exclusionary zoning" fails on its merits.

24

Moreover, as Defendants note, the Amendments only apply to new homes in four zoning districts.[10] There are nine residential districts and fourteen total zoning districts in the Village's jurisdiction that allow residential uses of some type. Plaintiffs offer no evidence regarding the availability of "affordable homes" before the Amendments were enacted, nor have they shown that the Village does not have "affordable housing" options, such as mobile homes, apartment complexes, condominiums, etc. Indeed, Defendants' evidence demonstrates that the Village *does* provide affordable housing, as the Village PDO allows mobile homes and multi-family dwellings (e.g., apartments and condominiums), duplexes, and town houses in the Village's zoning jurisdiction.[11] (*See* Second Correll Aff. ¶¶ 2 & 3, docket no. 75.) For all of these reasons, Plaintiffs' claim of "exclusionary zoning" cannot withstand summary judgment.

## C. Equal Protection Claim

Plaintiffs also assert claims for violations of their federal and state equal protection rights. The Fourteenth Amendment to the U.S. Constitution provides, in part, that "[n]o state shall make or enforce any law which shall . . . deny to any

---

[10] The landscaping amendments apply to all residential zones except for one, and the architectural amendments apply to only R-10, R-15, and R-20.

[11] Moreover, as Defendants note, as of December 2006, shortly after the Amendments were enacted, 70% of the lots in the R-8, R-10, R-15, and R-20 districts were already built out. (*See* Second Correll Aff. ¶ 5.) Even assuming that Plaintiffs' allegations regarding the price increase are true, excluding lower-income buyers from 30% of four residential districts in the Village does not prove "exclusionary zoning" for the entire Village.

person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1.  The state counterpart to the Fourteenth Amendment is found in Article 1, Section 19, of the North Carolina Constitution.  N.C. CONST. art. I, § 19.  The Equal Protection Clause of the Fourteenth Amendment "requires that the states apply each law, within its scope, equally to persons similarly situated, and that any differences of application must be justified by the law's purpose."  *Sylvia Dev. Corp.*, 48 F.3d at 818.  "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993).  As the Supreme Court held in *Beach Communications, Inc.*:

> [T]hose attacking the rationality of the legislative classification have the burden "to negative every conceivable basis which might support it." Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.

*Id.* at 315 (internal quotations and citations omitted).  The Fourth Circuit has affirmed the settled principle that, in the absence of a classification that is considered "suspect," such as race, ethnicity, national origin, religion, or sex:

> legislation will be sustained if the classification utilized by the statute is "rationally related to a legitimate state interest."  Thus, when social or economic legislation is involved, the states are permitted wide latitude in adopting classifications to further legitimate governmental purposes.

*Sylvia Dev. Corp.*, 48 F.3d at 820 (citation omitted).  Furthermore, the mere fact that a person is treated differently from someone who is similarly situated is not sufficient to run afoul of the Equal Protection Clause.  As the Fourth Circuit has explained:

26

> If disparate treatment alone were sufficient to warrant a constitutional remedy, then every blunder by a local authority, in which the authority erroneously or mistakenly treats an individual differently than it treats another who is similarly situated, would rise to the level of a federal constitutional claim.

*Id.* at 825.

Thus, there are two prongs to an equal protection claim. First, the plaintiff must show that the governmental entity created a classification that singles out a particular group of individuals for special treatment. Next, the court must analyze the state's action with the appropriate degree of scrutiny. When governmental action does not burden a fundamental right or employ a suspect classification, the pertinent question for determining whether the governmental action violated the Equal Protection Clause is whether the government officials reasonably could have believed that the action was rationally related to a legitimate governmental interest. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, Va.,* 135 F.3d 275, 290 (4th Cir. 1998).

Plaintiffs' equal protection claim is premised on their allegations that the architectural and landscaping Amendments treat builders who build in the R-8 and R-10 zoning districts less favorably than those who build in other zoning districts because the Amendments impose a higher financial burden on those who build in the R-8 and R-10 districts. (*See* Br. Opp. p. 16.) Plaintiffs also contend that, by passing the Amendments, Defendants are attempting to exclude housing for lower-

income individuals and families. For the following reasons, Plaintiffs' equal protection claim is without merit.

As Defendants note, Plaintiffs have not shown that they are similarly situated to other builders; rather, they simply contend that they should be treated the same as builders who build in zones other than the R-8 and R-10 districts. Although regulations in one zoning district must be the same, North Carolina law expressly provides that regulations in one district may differ from those in other districts. *See* N.C. GEN. STAT. 160A-382(c). Plaintiffs have no constitutional right to build homes under the same regulations in the R-8 and R-10 zoning districts as are applicable in other zoning districts in the Village.

In any event, Plaintiffs are not within one of the "suspect" classifications for purposes of an equal protection analysis. Thus, the government's burden is to show that the Amendments at issue here were rationally related to a legitimate government interest. Defendants have easily met this burden. As discussed in the due process analysis, in passing the amended ordinances to require the landscaping and architectural elements in certain residential zones, the Village of Pinehurst has shown that its actions were rationally related to its legitimate ends. The relevant question under rational-basis review is whether local officials "reasonably could have believed that [their] action was rationally related to a legitimate government interest." *Front Royal*, 135 F.3d at 290. The actual motivation for the Village's actions is irrelevant. *Id.*; *accord United States v. O'Brien,* 391 U.S. 367, 383-84 (1968). Here,

28

the Village could have reasonably believed that imposing certain landscaping and architectural requirements for new homes in certain residential districts would help to maintain the Village's already existing architectural style and beauty. Thus, Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

D. North Carolina Public Records Claim

On February 15, 2007, Plaintiffs supplemented their Complaint to add a claim under the North Carolina Public Records Act as their "Fourth Claim for Relief." In support of this claim, Plaintiffs allege that on December 22, 2006, Jessica Liles, an employee of QB, went to the Office of the Clerk of the Village of Pinehurst to get certified copies of Sections 10.2.6.3 and 10.2.6.5 of the PDO and certified copies of the minutes of the August 22, 2006, Village Council meeting, including attachments. The Village Clerk refused to turn over copies of the documents to Liles on that day. It is undisputed that the Village eventually produced the documents. Although the parties dispute exactly when the documents were subsequently produced, it is undisputed that the Village produced the documents by no later than 13 days after the original request. Plaintiffs allege a violation of the North Carolina Public Records Act based on the Village's initial refusal to produce the documents on the day they were requested.

The North Carolina Public Records Act ("NCPRA") provides, in pertinent part, that "it is the policy of this State that the people may obtain copies of their public records . . . ." N.C. GEN. STAT. § 132-1(b). Section 132-6(a) of the NCPRA provides:

> Every custodian of public records shall permit any record in the
> custodian's custody to be inspected and examined at reasonable times
> and under reasonable supervision by any person, and shall, as
> promptly as possible, furnish copies thereof upon payment of any fees
> as may be prescribed by law.

N.C. GEN. STAT. § 132-6(a) (2005). Public agencies are not required to respond "to requests for copies of public records outside of its usual business hours." *Id.* §§ 132-6; 132-6.2(d). Persons may likewise request "certified copies." *Id.* § 132-6.2(b). Plaintiffs have asserted a claim pursuant to section 132-9(a), which states: "Any person who is denied . . . copies of public records, may apply to the appropriate division of the General Court of Justice for an order compelling disclosure or copying, and the court shall have jurisdiction to issue such orders." *Id.* § 132-9(a).

Significantly, the NCPRA does not provide a claim for relief after documents have been produced, nor does it provide for a remedy that would prevent potential future violations. Here, it is undisputed that the Village produced copies of the records that were requested. Plaintiffs requested the records on December 22, 2006, the Friday before Christmas. The Village's offices were closed for the Christmas holiday on both Monday, December 25 and Tuesday, December 26. (*See* Hutchinson Aff. ¶ 4.) Defendants contend that the records were available to be picked up the following Wednesday, December 27, 2006. Plaintiffs contend that they were not ready until Wednesday, January 3, 2007. As Defendants note, however, regardless of whether the copies were ready on December 27 or

January 3, the NCPRA does not provide relief for mere delay in producing copies of public records.

In their response brief, Plaintiffs acknowledge that the NCPRA provides no remedy for a mere delay in producing public records. *See* N.C. GEN. STAT. § 132-9(a). Plaintiffs have therefore withdrawn their request for attorney's fees and now seek only "nominal damages." The NCPRA does not, however, provide for an award of damages, nominal, or otherwise, for mere delay in producing the records. Furthermore, the NCPRA does not allow for prospective injunctive relief for potential future violations. For these reasons, Defendants are entitled to summary judgment as to this claim.

Finally, Defendants have asked for attorney's fees for having to defend against Plaintiff's NCPRA claim pursuant to N.C. GEN. STAT. § 132-9(d). Section 132-9(d) states:

> If the court determines that an action brought pursuant to this section was filed in bad faith or was frivolous, the court shall assess a reasonable attorney's fee against the person or persons instituting the action and award it to the public agency as part of the costs.

*Id.* § 132-9(d). I find that Plaintiffs' claim was, at least, frivolous and, at most, brought in bad faith. Plaintiffs have never contended that Defendants did not produce copies of the requested documents. Moreover, it appears that Defendants produced copies within a reasonable time from the request, particularly given that the request was made on December 22, the Friday before the week of Christmas. Plaintiffs contend in their brief opposing the summary judgment motion, and

31

Defendants do not deny, that employees of the Village called police to order QB employee Liles off the premises after the Village denied her request for copies on Friday, December 22. The fact that Defendants called the police on one of Plaintiffs' employees appears to be, at least in part, a catalyst for Plaintiffs' filing of a claim against Defendants under the NCPRA. The fact that the Village employees summoned the police when Liles would not leave the office does not negate the frivolous nature of Plaintiffs' claim. In sum, I agree that Defendants are entitled to recover reasonable attorney's fees incurred in defending this claim.

E. Breach of Contract Claim

Finally, Plaintiffs have not responded to the Village's Motion for Summary Judgment on their breach of contract claim. Therefore, this claim is deemed abandoned.

**CONCLUSION**

For the reasons stated above, Defendants' Motion to Strike Plaintiffs' Affidavits in Opposition to Defendants' Motion for Summary Judgment (docket no. 76) is **GRANTED**, Defendants' Motion for Summary Judgment (docket no. 69) is **GRANTED**, and the case is dismissed with prejudice. Furthermore, Defendants' request for attorney's fees incurred in defending the claim brought under the North Carolina Public Records Act is **GRANTED**. Defendants must submit their application for a fee award no later than Wednesday, September 3, 2008, and

Plaintiffs may respond no later than Friday, September 12, 2008.[12]  Last of all,

Defendants' request for attorney's fees in bringing the motion to strike is **DENIED**.

A judgment will be entered simultaneously herewith, but the case will remain

open for the purpose of the entry of a fee award if Defendants' pursue that relief.

_WALLACE W. DIXON_
WALLACE W. DIXON
United States Magistrate Judge

August 11, 2008

---

[12]  Defendants are cautioned that they should consider the so-called *Barber v. Kimbrell's* factors, to the extent they are applicable here, in submitting their fee application. 577 F.2d216, 226 (4th Cir. 1978).